IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DIANE SUE MARTIN, | ) | CASE NO. 3:17-CV-799 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Diane Sue Martin ("Martin") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

Magistrate Judge pursuant to the consent of the parties.  Doc. 16.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

Martin protectively filed applications for DIB and SSI on July 10, 2013, alleging a

disability onset date of July 7, 2009.  Tr. 19, 283.  She alleged disability based on the following:

neck surgery; concussive syndrome; narcolepsy; sleep apnea; pain in both hands and possible

surgery in right hand; memory issues; ADHD; headaches; left arm, shoulder and trapezius

damage with pain and numbness; lumbar surgery on the left side; lumbar pain in her right side,

possible surgery; and right leg pain and numbness.  Tr. 271.  After denials by the state agency

initially (Tr. 105, 106) and on reconsideration (Tr. 119, 120), Martin requested an administrative

hearing.  Tr. 159.  A hearing was held before Administrative Law Judge ("ALJ") Patricia

Witkowski Supergan on December 15, 2015.  Tr. 36-82.  In her March 22, 2016, decision (Tr.

19-30), the ALJ determined that there are jobs that exist in significant numbers in the national

economy that Martin can perform, i.e. she is not disabled.  Tr. 28.  Martin requested review of

the ALJ's decision by the Appeals Council (Tr. 14) and, on February 16, 2017, the Appeals

Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr.

1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Martin was born in 1964 and was 49 years old on the date her applications were filed.  Tr.

28.  She last worked in July 2009 as an inspector/packer.  Tr. 263, 74.  At the time her

applications were filed, she had had two years of college and was working towards completion.

Tr. 272.

### B. Relevant Medical Evidence[1]

#### 1. Dr. Mysiw

On November 17, 2010, Martin saw Jerry Mysiw, M.D., for evaluation at the Head Injury

Clinic in the Department of Physical Medicine and Rehabilitation at The Ohio State University.

Tr. 549.  She had suffered a head injury from a motorcycle crash in 2007.  Tr. 549.  She

complained of the following difficulties: frequent and significant memory and concentration

issues warranting cues, processing speed that was a "bit slow" up to a few times a day when she

did an activity that required serious mental effort, mental fatigue that caused her to abandon tasks

after a short period of time and caused increased irritability and which required several days of

rest to recover, poor organization and sequencing skills, attention impairments that severely

---

[1]  Martin only challenges the ALJ's findings regarding her neuropsychological impairments.  Doc. 17, p. 2.
Accordingly, only the medical evidence relating to these impairments is summarized and discussed herein.

limited her activities of daily living, low frustration tolerance, anger control difficulty, and low stress tolerance. Tr. 549. Her vertigo had improved and at the time she only occasionally stumbled. Tr. 549-550. She was "driving already," was a full-time student and "live[d] alone or independently." Tr. 550. Upon exam, she was alert and oriented to person, place, and time and had a normal mood, affect, behavior, speech, dress, motor activity, and thought processes. Tr. 553. Dr. Mysiw diagnosed her with a traumatic brain injury and prescribed various medications. Tr. 554.

Martin returned to Dr. Mysiw on February 10, 2011. Tr. 543. Her chief complaint was memory changes. Tr. 543. She was "driving already," lived alone or independently, and was a full time student. Tr. 545. Upon exam her mental status was normal. Tr. 547. She was independent in the following activities of daily living: bathing and hygiene, feeding, continence, grooming, toileting and dressing. Tr. 548. The treatment note reads, "distant supervision and assistance is provided by the family as the patient is not sufficiently IADL independent to live alone." Tr. 548. Her prescription for Aricept was increased to help with memory and organizational skills. Tr. 548.

Martin continued to see Dr. Mysiw through August 2015. Tr. 927. During the intervening time, Martin continued to complain of difficulty with her memory, concentration, and processing speed but also reported some improvement with her medications. Tr. 397, 524, 532, 538. Dr. Mysiw had observed that her cognitive issues had improved (Tr. 397, 524, 532, 538, 890, 907, 927-928). On February 13, 2013, Martin reported being more social, having plans for a new business, and having a small part in a local musical production. Tr. 397. She lived alone and cared for her elderly father and was a full time student. Tr. 398. She was independent with her activities of daily living and she drove; nevertheless, Dr. Mysiw again noted that

"distant supervision and assistance is provided by the family as the patient is not sufficiently IADL independent to live alone."  Tr. 401.  Dr. Mysiw wrote, "It is important that you remain active as you are but I do agree that exploring disability is warranted."  Tr. 404.  At another visit Dr. Mysiw commented that Martin was doing an "outstanding job of increasing your socialization."  Tr. 530.

Dr. Mysiw's treatment notes consistently reflected that Martin was "living alone or independently" or "living alone caring for her elderly father."  Tr. 398, 525, 533, 539, 891, 907. She drove and was independent in activities of daily living, including walking, bathing, hygiene, feeding, grooming, and dressing.  Tr. 401, 528, 536, 542, 894, 910, 932.  She required assistance with her instrumental activities of daily living ("IADL").[2]  Tr. 401, 528, 536, 542, 894, 910, 932. She was consistently alert and oriented upon exam and her speech and affect were normal.  Tr. 400, 528, 535, 542, 893-894, 909, 932.  Dr. Mysiw's treatment consisted solely of medication management.  Tr. 529-530, 536-537, 542-543, 896, 910-912, 935.

### 2. Visits with Burpee, CNP

Martin also saw Susan Bowman Burpee, a certified nurse practitioner, at the Department of Physical Medicine and Rehabilitation.  Tr. 407.  On September 14, 2012, Martin reported that her attention had improved.  Tr. 408.  She was busy making costumes for a medieval festival and woodworking.  Tr. 408.  Her cognitive impairments were stable.  Tr. 408-409.  Upon exam she was alert and oriented in all spheres.  Tr. 412.  On June 3, 2013, Martin reported the following symptoms to Burpee: difficulty keeping track of time, problems staying on task, talking out loud, stuttering, and not finishing projects.  Tr. 390–391.  Burpee noted that Martin was only taking 10 mg of Aricept at bedtime.  Tr. 391.  Martin told Burpee that she had just celebrated her birthday,

---

[2] Instrumental Activities of Daily Living (IADL) include shopping, cooking, and managing finances.  See http://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/daily-activities.aspx.

her daughter's graduation, and that she was "[v]ery busy with party, graduation, prom" and that she was enjoying socializing and planning. Tr. 391. Her father had moved in with her "last year." Tr. 391. Upon exam, she appeared happy and appropriate and was oriented in all spheres. Tr. 393. Burpee adjusted her medication. Tr. 393-394.

On May 21, 2014, Martin saw Burpee again. Tr. 714. She reported that, generally, she has improved in some ways. Tr. 719. She still was slow to motivate, had improved focus, was still tired although her fatigue had improved, she was more efficient as she had learned how to compensate by using lists, she loses track of time, cannot read a book or watch a movie, and gets irritable when she has cognitive fatigue. Tr. 719. Upon exam, she was oriented in all spheres and Burpee adjusted her medications. Tr. 721-722. On October 29, 2014, Martin reported to Burpee that she was getting more things done during the day and had more energy. Tr. 902. Her current mood medication was providing better mood control and her eBay business was going well. Tr. 902. She reported caring for her elderly father. Tr. 902.

### 3. Testing by Dr. Ransom-Flint

On December 6, 2013, Martin underwent neuropsychological testing by Terry Ransom-Flint, Ph.D., to ascertain her level of cognitive functioning and to facilitate her return to school. Tr. 944–955. Martin detailed the history of her treatment with Dr. Mysiw beginning in 2010, including her diagnoses of traumatic brain injury, organic brain syndrome, mood disorder, vision changes, photosensitivity, phonophobia, and chronic post-traumatic headache with cognitive impairment, behavior changes, mood instability, and anxiety secondary to her traumatic brain injury. Tr. 945. She had some improvement throughout 2012 and 2013 but still reported problems with memory, cognitive fatigue, sleep disturbances, behavior regulation problems, anxiety, irritability, and chronic pain in her neck, back, and extremities. Tr. 945.

Martin was on time for her evaluation and was cooperative, polite, and friendly. Tr. 947. Her thought processes were generally logical, coherent, and goal-directed, although her responses at times were mildly tangential. Tr. 947. Her speech was clear but somewhat halting; she reported problems with word retrieval. Tr. 947. She exhibited a normal range of affect appropriate to the situation and denied being depressed or anxious, stating that her mood had been more stable since her brain injury (Martin explained that she had had mood problems since she was nine years old). Tr. 945, 947. She was independent in most areas of activities of daily living, including driving and light household work, and she reported waking up at 7:30 in the morning to care for her two cats and four dogs. Tr. 946-957. At the time of the evaluation, her cognitive fatigue and decreased endurance required her to work in brief intervals and take frequent breaks to rest. Tr. 947. She felt easily overwhelmed, had poor concentration, and was forgetful. Tr. 947.

Testing revealed that Martin was in the average to high-average range regarding auditory attention and basic visual attention; however, she displayed indicators of inattention and decreased vigilance during the portion of the testing that evaluated sustained visual attention. Tr. 948. Martin's "reaction times became considerably slower and less consistent as the administration of the test progressed. She also appeared to have difficulty making necessary adjustment to the change in tempo of stimulus presentation which suggests difficult[y] adjusting to changing task demands." Tr. 948. Her general memory index score was in the high average range but she had mild-to-moderate impairments in tests evaluating word recall. Tr. 949. Dr. Ransom-Flint observed that Martin endorsed symptoms consistent with post-traumatic stress disorder, anxiety, and depression. Tr. 952. Dr. Ransom-Flint opined that, with respect to Martin's treatment planning or return to school recommendations, Martin would benefit from

working in an environment in which distractions are minimized (e.g. study or exam environments); would need frequent breaks and, if frequent breaks are unavailable, her work may suffer and would benefit from being checked by others; when possible, complex new instructions should be provided in writing, although she should perform well on familiar, complex tasks; due to her manual dexterity issues, she would do best working at a comfortable pace and, when possible, should avoid tasks that require her to work under time pressure or manipulate objects; would benefit from frequent breaks when performing demanding tasks or brief naps during the day to revitalize; and may require assistance in recognizing when such breaks are needed. Tr. 953-954. Martin should gradually transition back to school and various strategies for academic success were suggested. Tr. 954.

### 4. Other providers

Treatment notes from Martin's visits to other providers consistently showed normal psychiatric examinations; she had a normal mood and affect, was alert and oriented, and had non-pressured, non-tangential speech. Tr. 438, 445, 454, 455, 744–745, 753, 824.

## C. Medical Opinion Evidence

### 1. Treating Source Opinion

On May 28, 2014, Burpee completed a "medical statement concerning organic brain syndrome" that was also signed by Dr. Mysiw on May 29. Tr. 915-918. Burpee indicated that Martin had memory changes, changes in personality and disturbances in mood and moderate restrictions in activities of daily living and moderate difficulty maintaining social functioning. Tr. 915. Even a minimal increase in mental demands or a change in environment would cause Martin to decompensate and she had a history of at least one year of an inability to function outside a highly supportive living arrangement with the continued need for such an arrangement.

Tr. 916. Burpee checked boxes indicated that Martin was moderately or markedly limited in 18 out of 20 work-related areas of functioning: she was moderately impaired in her ability to understand and carry out short, simple and detailed instructions; interact appropriately and get along with others; respond to changes in the work setting; and to travel to unfamiliar places or use public transportation. Tr. 916-918. She was markedly impaired in her ability to work within a schedule and sustain a routine; to make simple work related decisions; to accept instructions and criticism from supervisors; and to set realistic goals and make plans independently of others. Tr. 917-918. A large area provided for comments but neither Burpee nor Dr. Mysiw provided any.

On April 29, 2015, Dr. Mysiw wrote a letter in which he stated that Martin was "totally disabled" from a combination of cognitive, neurobehavioral, and physical consequences of her 2007 injury and noted that she was scheduled for back surgery in May. Tr. 815.

On December 28, 2015, Dr. Mysiw wrote that Martin was "totally disabled" due to cognitive impairments (some degree of improvement with medication), short term memory impairments, an attention impairment, pain, vestibular abilities (improved to an extent), and vision issues that affected her balance. Tr. 937.

### 2. State Agency Reviewing Physicians

On August 22, 2013, state agency reviewing psychologist Frank Orosz, Ph.D., reviewed Martin's record. Tr. 98-99. Dr. Orosz opined that Martin's impairments did not meet Listings 12.02, 12.04, or 12.06, explaining that she had no more than moderate deficiencies in any Paragraph "B" criteria of the listings (activities of daily living, maintaining concentration, persistence, or pace, and maintaining social functioning) and no evidence establishing Paragraph "C" criteria. Tr. 98-99.

On February 25, 2014, state agency reviewing psychologist Bruce Goldsmith, Ph.D., reviewed Martin's record and agreed with Dr. Orosz's conclusions with respect to the considered listings.  Tr. 112-113.

### D. Testimonial Evidence

#### 1. Martin's Testimony

Martin was represented by counsel and testified at the administrative hearing.  Tr. 43-73. The ALJ went through the exhibits and, although Martin's attorney stated that there were no outstanding records of significance (just some updated treatment records from Dr. Mysiw), the ALJ questioned where the five to six hour long psychological evaluation from Dr. Terry Ransom-Flint was in the record.  Tr. 40-42.  Martin's attorney conceded that it was not in the record and the ALJ left the record open for another 30 days for Martin to provide it.  Tr. 41-43.

Martin testified that she believed she was disabled because, since her accident, it almost seemed like her brain had slowed down.  Tr. 43.  When she would do things at work or at home that she had done several times before she would forget how to do it.  Tr. 43.  She would have to think about it before she could finish.  Tr. 43.  She does not feel like she can go out in public and she does not like crowds.  Tr. 43.  She gets tired very easily and she can't do anything.  Tr. 43. She can't do anything on a regular schedule, such as making dinner or cleaning the house.  Tr. 43.

Martin confirmed that she had gone back to work for a few years after her accident in 2007.  Tr. 43.  When she returned to work after her accident "they were already talking about shutting down the plant" and she wanted to make sure she hung in there until the end.  Tr. 44. She had problems completing things and in the mornings at work she would get so tired she would go to the restroom to rest for a little bit because she couldn't stay awake.  Tr. 44.  Her

brain would be tired. Tr. 44. After her job ended she had neck surgery, and when that healed she went to different agencies to try to find a job. Tr. 44. She also went back to school to try to get trained in something else, from about 2010 to 2012. Tr. 44-45. She was taking classes in medical billing and office management. Tr. 44. She was doing really well when she first started and made the honor roll, but as she got into the math classes more heavily she would get confused. Tr. 44-45. She actually blacked out a couple of times. Tr. 45. It seemed like the more information that she got into her head the worse it got and towards the end of her schooling her grades were going down and she could not complete the schooling, although she only had a couple of classes left, because she was having problems reading. Tr. 45. She can't pick up a book and read it because her eyes wander around the page. Tr. 45. She can read short things but not books. Tr. 45.

Martin is divorced and has two adult children. Tr. 45-46. She lives in a house and her older daughter just moved back in with her and she also lives with her elderly father. Tr. 46. Prior to her father moving in with her, he lived alone and she would go over to his apartment to check on him. Tr. 57-58. Now she takes care of his medications for him and, each time she fills his medications, she makes sure to read every bottle and look at every pill so that everything is right. Tr. 58. She occasionally cooks and makes things like fried baloney sandwiches and, once in a blue moon, she'll make a roast; she also cooks chicken and noodles easily. Tr. 46-47. For the recent Thanksgiving holiday she got a meal from the grocery store that included the turkey and stuffing and other things and her daughter heated everything up. Tr. 47. Martin wrote down all the directions of what to do and when to do it for her daughter so that it would be easy for her daughter and her daughter would not have to look at individual packages to see what to do. Tr.

47-48. Martin likes to have everything ready at the same time. Tr. 48. She also helped her daughter somewhat and put all the utensils and dishes out. Tr. 47.

Martin goes grocery shopping about twice a month; she makes a list. Tr. 49. If she needs something she also goes to a nearby smaller store to get what she needs and it's not so exhausting. Tr. 49. She has a driver's license and drives with no restrictions. Tr. 49. Typically, she does not go out very often and only goes to the grocery store. Tr. 49. She drove to the hearing and also takes her father to his doctor appointments about a mile away from her home. Tr. 49, 58. When she drove to the hearing she used GPS and had to listen to it and concentrate on what she was doing and she was fine. Tr. 49-50. She used to go out to museums, hike and perform in musicals at the local theater but she does not do those things now and "doesn't drive anywhere now." Tr. 50. She did fly to Florida to help her daughter leave when her daughter's husband became abusive. Tr. 50. She flew down by herself, helped her daughter pack up her things, shipped the things, and flew back home. Tr. 51. When her youngest daughter graduated from high school in 2013 she had a party and Martin made some of the food and a cake. Tr. 51-52. She used to decorate cakes. Tr. 52. The cake took her two days to make and decorate because she wanted it to be very special for her daughter. Tr. 52. She also had to take her daughter's prom dress that she had ordered online to be fitted three or four times. Tr. 52-53. That was tiring but they got through it. Tr. 53. Her kids are important to her and she will do anything for them, even if it exhausts her. Tr. 53.

The last time she went out socially was about two years prior when she met some friends from high school for dinner and drinks. Tr. 53. Otherwise, she has one really close friend that she has not talked to in a while. Tr. 54. She gets to the point where she is so tired or feels like she has so much to do in her house that it is easier for her to stay there "in my little safe place"

and she does not want to call other people and listen to their problems. Tr. 54. She has 500 friends on Facebook. Tr. 54. She has so many Facebook friends because she plays games on Facebook. Tr. 55. Dr. Mysiw had recommended that she play "racing games" to challenge her mind and word games, but she finds them so challenging that they would exhaust her so now she plays video games for about an hour a day. Tr. 55. She also checks her email online and surfs the web. Tr. 55-56. She like websites that show you how to do things more efficiently, e.g., an easier way to boil potatoes, and to look at silly pictures of animals. Tr. 56. She also does her banking online. Tr. 56.

Martin testified, "I can't stay on a schedule for any reason." Tr. 61. She makes a lot of lists. Tr. 61. She has a calendar that she writes down all her dates on. Tr. 61. She has issues with starting things and not finishing them. Tr. 62. She tries really hard to finish things and it may take her a little bit longer to finish. Tr. 62. She has had changes in her personality but she is "doing pretty good." Tr. 62. However, she cannot deal with listening to other people whining about their problems. Tr. 62. She also has "kind of a form of narcolepsy" and she falls asleep when she is not "actually doing something." Tr. 65. If somebody was talking to her she would not doze off but if she is just sitting quietly she could. Tr. 65.

### 2. Medical Expert's Testimony

Medical Expert Dr. Hugh Savage ("ME") testified at the hearing. Tr. 69-78. Martin's attorney did not object to his qualifications. Tr. 67. Dr. Savage detailed Martin's medically determinable impairments: sleep apnea, GERD, ADHD, hypertension, migraines, status post cervical spine fusion surgery, status post laminectomy L5-S1 on the left side and radiopathic pain on her right side at L4 and in her right leg, treatment for cognitive neuro behavioral abnormalities since her 2007 accident, late effect intracranial energy without skull fracture, mood

disorder, and anxiety. Tr. 67-67. The ALJ asked the ME if Martin met any listings and the ME answered that he did not believe that she did. Tr. 69-70. Based on his review of the record, the ME opined that Martin could perform the following activities of daily living: shopping, traveling without a companion and ambulating, preparing a simple meal and caring for herself. Tr. 71-72. Martin's attorney asked the ME whether he had considered Listing 12.02 for organic mental disorders and the ME responded that he had. Tr. 72. The ME stated that he was not a mental health expert but he noted what Martin had described in the record—not following through, stuttering and being shaky, talking loud, mood shifts, difficulty with detailed instructions—and the testimony was not specific enough to restrict her to more than he had. Tr. 72. Martin's attorney asked the ME to explain his answer and referenced notes from Dr. Mysiw regarding memory impairment, change of personality and disturbance in mood. Tr. 72-73. The ME explained that he looked at the Paragraphs A, B and C criteria of Listing 12.02 and did not feel that Martin met them or is unable to engage in work activity. Tr. 73. He agreed that she had limitations, but observed that Martin's mood disturbances has been treated with medications and he did not get the sense, from the record or from Martin's testimony, that her emotional ability was markedly limited as indicated in the record referenced by counsel. Tr. 72-73.

### 3. Vocational Expert's Testimony

Vocational Expert ("VE") Kathleen Dela testified at the hearing. Tr. 78-85. The ALJ discussed with the VE Martin's past work as an inspector/packer. Tr. 78-79. The ALJ asked the VE to determine whether a hypothetical individual with Martin's age, education and work experience could perform any work if the individual had the following characteristics: can perform light work, can occasionally climb ramps and stairs but not ladders, ropes or scaffolds, can occasionally balance, stoop, kneel, crouch and crawl, can tolerate occasional exposure to

and/or work around hazards such as moving machinery or unprotected heights, and can perform simple, routine work requiring no more than short simple instructions, simple work related decision making or few workplace changes.  Tr. 76.  The VE answered that such an individual could perform work as a mail clerk (1,200 Ohio jobs, 32,900 national jobs); order caller (1,500 Ohio jobs, 36,300 national jobs); and sales attendant (8,000 Ohio jobs, 209,600 national jobs). Tr. 76-77.  The ALJ asked the VE if there would still be jobs for such an individual if the individual was further limited to sedentary work with the same postural, environmental and mental limitations.  Tr. 77.  The VE stated that such an individual could perform work as a cutter and paster (1,100 Ohio jobs, 22,900 national jobs); circuit board assembler (1,100 Ohio jobs, 29,000 national jobs); and address clerk (1,100 Ohio jobs, 66,700 national jobs).  Tr. 77.  The ALJ asked if the number and types of jobs identified by the VE would change if the individual would need an assistive device such as a cane to ambulate to and from the work station and the VE answered that there would be no effect on the number of jobs.  Tr. 78.  The ALJ asked if the number and types of jobs identified by the VE would change if the individual would need to change position from sitting to standing on an hourly basis for approximately five minutes and the VE answered that there would be no effect on the number of jobs.  Tr. 78.

Next, the ALJ asked the VE what percentage of the day must an individual be on task to maintain competitive employment and the VE stated, "85% throughout the day."  Tr. 78.  The ALJ asked how many excused or unscheduled absences are tolerated in a competitive work environment and the VE stated that, typically, between 10 and 14 absences a year, approximately one per month, with only one in the first 90 day probationary period, are tolerated.  Tr. 78.

Martin's attorney asked the VE whether her prior answers would change if the individual needed to prop up her legs to waist level while sitting.  Tr. 79.  The VE replied that doing so

would preclude all the positions because it would decrease arm span.  Tr. 79.  If only one leg was

required to be raised, work at the sedentary positions would be possible if reasonably

accommodated.  Tr. 79-80.  Martin's attorney asked if needing written instructions would affect

an individual's ability to work and the VE did not believe that it would.  Tr. 80.  Martin's

attorney asked if needing occasional supervision to stay on task, i.e., a supervisor had to check

on an individual throughout the day to ensure that she was staying on task and, if necessary,

correct her, would affect an individual's ability to work.  Tr. 80.  The VE stated that, were the

individual to need such supervision every day past the training period, it would not be

acceptable.  Tr. 81.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her March 22, 2016, decision, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2014. Tr. 21.

2.  The claimant has not engaged in substantial gainful activity since July 7, 2009, the alleged onset date. Tr. 21.

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3. The claimant has the following severe impairments: obesity, status post two fusion surgeries, obstructive sleep apnea, status post traumatic brain injury, attention-deficit hyperactivity disorder (ADHD), anxiety, and depression.  Tr. 21.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 22.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps and stairs but can never climb ladders, ropes or scaffolds.  She can occasionally balance, stoop, kneel, crouch and crawl.  She can tolerate occasional exposure to and/or work around hazards such as moving machinery and unprotected heights.  She can perform simple, routine tasks requiring no more than short, simple instructions and simple work-related decision making with few workplace changes.  Tr. 24-25.

6. The claimant is unable to perform any past relevant work.  Tr. 28.

7. The claimant was born on June 1, 1964 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age.  Tr. 28.

8. The claimant has at least a high school education and is able to communicate in English.  Tr. 28.

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.  Tr. 28.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 28.

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2009, through the date of this decision.  Tr. 30.

## V. Plaintiff's Arguments

Martin challenges the ALJ's decision on three grounds: finding that Martin did not meet Listing 12.02; failing to consider all the evidence from Martin's treating physician, Dr. Mysiw; and improperly giving controlling weight to the opinion of the medical expert, Dr. Savage.  Doc. 17, pp. 1, 12-19.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681

(6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984).

## VII. Analysis

### A. The ALJ properly evaluated the evidence from Dr. Mysiw

Martin argues that the ALJ failed to properly evaluate the evidence and opinions from Dr.

Mysiw, her treating physician. Doc. 17, p. 16. She states that he is a renowned physician, she

had regular treatment with him from 2010 to 2015, and that his records are "replete with

descriptions of [Martin's] cognitive deficiencies, and her inability to live on her own." Doc. 17,

p. 17.

The ALJ considered evidence from Martin's visits with Dr. Mysiw (Tr. 26) and his

opinions and explained,

> I give the December 28, 2015 medical source statement of W. Jerry Mysiw, M.D., no
> weight because it is not a function-by-function analysis (SSR 96-8p; Exhibit 22F).
> Additionally, his opinion is conclusory with little explanation. Lastly, his opinion is not
> supported by his own objective clinical or laboratory findings or other evidence,
> including treatment notes indicating that the claimant's symptoms have resolved (Exhibit
> 25F). Lastly, the claimant also owns her own business, which suggest her cognitive,
> attention, and memory impairments are not as limited as suggested by Dr. Mysiw
> (Exhibits 5F/2; 17F/14; 21F/8).

Tr. 27. The latter treatment notes cited by the ALJ show that Martin started a new business selling the contents of abandoned storage lockers in December 2013 (Tr. 584), her eBay business was going well in October 2014 (Tr. 902), and in August 2015 she had plans for a new business (Tr. 928). The ALJ continued,

> I give Dr. Mysiw's additional opinions contained in the record no weight because they appear to be based on the claimant's subjective complaints (Exhibit 15F/1; 19F/1-4). Moreover, these functional limitations appear to be sympathetic opinions, as Dr. Mysiw's opinions are not supported by his own objective clinical or laboratory findings (Exhibit 21F). More importantly, the claimant describes a wide range of activities, as discussed above. Dr. Mysiw also ignored her ability to return to work after injury (Exhibit 9F). Dr. Mysiw stated the claimant is totally disabled; however, whether a claimant is disabled is a matter reserved for the Commissioner (Exhibit 15F/1).

Tr. 27. The wide range of activities described by Martin that the ALJ referenced previously discussing include performing household chores (vacuuming, cooking), caring for herself, helping her elderly father, flying to Florida to help her abused daughter move back to Ohio, playing games on Facebook, going grocery shopping, gardening, taking her father to his medical appointments, managing her father's medications, paying her bills on time and online, researching things on the computer, regularly driving, having a role in a local theater musical production, and planning a Thanksgiving meal. Tr. 23-27. Thus, the ALJ considered evidence and opinions from Dr. Mysiw.

Martin's insistence that Dr. Mysiw opined that she is unable to live alone has no support in the record. Martin has been living on her own quite ably by all accounts. Indeed, she even takes care of others. Not only is Dr. Mysiw's opinion in this respect not supported by the record, it is a glaring inconsistency that provides a reasonable basis for the ALJ to doubt the remainder of Dr. Mysiw's opinions.

Martin asserts that Dr. Mysiw's opinions are consistent with the evidence from her neuropsychological testing, remarking that she demonstrated problems with attention, vigilance, slow processing, adapting to changing task demands, and learning and memory impairments. Doc. 17, p. 17. However, the question is not whether Martin has mental impairments; the question is to what extent these impairments limit her ability to perform work. The ALJ accounted for Martin's mental limitations by restricting her to simple, routine tasks requiring no more than short, simple instructions, simple work-related decision making, and few workplace changes. Tr. 24-25.

Finally, Martin complains that the ALJ incorrectly stated that Dr. Mysiw's opinion shows that Martin's symptoms have resolved. Doc. 17, p. 17. The Court disagrees. Dr. Mysiw's opinion refers to all her issues, physical and mental, resulting from her 2007 accident, and references Martin's upcoming back surgery. Tr. 937. In her explanation, the ALJ cited a treatment note showing that Martin's back surgery had been successful, i.e., this issue had been resolved. Tr. 27 (citing "Exhibit 25F," Tr. 956-957). Moreover, the ALJ also explained that Dr. Mysiw's December 2015 opinion is not a function-by-function analysis, it was conclusory with little explanation, it was not supported by his own objective clinical or laboratory findings or other evidence, including the fact that Martin owns her own business, which suggests that Martin's cognitive, attention, and memory impairments are not as limited as Dr. Mysiw suggested. Martin does not challenge these reasons. To the extent she generally alleges that Dr. Mysiw's records are "replete with descriptions of her cognitive difficulties" Doc. 17, p. 17, her treatment records with Dr. Mysiw were, upon objective exam, clinically normal, and only abnormal with respect to Martin's subjective complaints, as the ALJ observed (Tr. 27). And, although Dr. Mysiw's treatment notes stated that Martin needed assistance with instrumental

activities of daily living (e.g., shopping, cooking, managing finances), Martin needed no assistance (and had even been assisting others) with instrumental activities of daily living. All these reasons are proper bases to rely on when rejecting a treating physician's opinion. *See* 20 C.F.R. § 416.927(c) (when considering opinion evidence, an ALJ considers the supportability of the opinion and the consistency of it with the record as a whole); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

In sum, the ALJ's assessment of Dr. Mysiw's opinions were supported by substantial evidence and, therefore, her decision must be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

### B. The ALJ did not err when she found that Martin did not meet Listing 12.02

Martin argues that the ALJ erred when she found that Martin did not meet the criteria in Listing 12.02. Doc. 17, p. 12. At Step Three, an ALJ considers whether the claimant has an impairment that meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. §404.1520(a)(4)(iii). A claimant must meet all of the specified medical criteria to show that her impairment matches an impairment in the listings; an impairment that manifests only some of those criteria, no matter how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

The parties agree that Listing 12.02, which was revised after the ALJ's decision,[4] was previously called "organic mental disorders" and required that a claimant satisfy the criteria in paragraphs A and B or C. In sum, a claimant must show the loss of specific cognitive abilities or affective changes and the medically documented presence of, e.g., disorientation to time and

---

[4] *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138, 2016 WL 5507752 (Sept. 26, 2016).

place, memory impairment, or mood disturbance (Paragraph A), resulting in at least two of the following: marked restrictions in daily living, maintaining social functioning, difficulties maintaining concentration, persistence or pace, or repeated episodes of decompensation, each of extended duration (Paragraph B); or a claimant must show a medically documented history of a chronic mental disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of 1 or more years of an inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement (Paragraph C). Doc. 17, pp. 13-14; Doc. 18, pp. 10-15.

Martin argues that Dr. Mysiw's opinions established that she met all the criteria for paragraphs A, B and C. Doc. 17, p. 14. This argument fails because, as detailed above, the ALJ explained why she did not credit Dr. Mysiw's opinions. Martin contends that the ALJ's Step Three analysis is insufficient because, with respect to whether Martin satisfied the Paragraph C criteria, the ALJ only recites the Paragraph C criteria and concludes that she does not meet it, i.e., she did not explain her conclusion. Doc. 17, p. 15. The ALJ, considering the Paragraph C criteria, explained,

> In this area, the evidence fails to establish the presence of the "paragraph C" criteria. There is no indication from the record that the claimant's mental impairment has resulted in such marginal adjustment that even a minimal increase in mental demands or a change in the environment would be predicted to cause decompensation. The claimant, furthermore, does not have a history of an inability to function outside of a highly supportive living arrangement for one or more years.

Tr. 24. This explanation is sufficient and accurate. With respect to Martin's challenge to the ALJ's finding that there is no evidence that a minimal increase in mental demands or changes in environment would cause decompensation, Martin argues that "the medical record establishes this very phenomenon" and cites to the checkbox form filled out by Burpee and signed by Dr. Mysiw (Doc. 17, p. 15, citing Tr. 916), which the ALJ did not credit. Martin does not point to any other record evidence showing that she meets this criteria. And she only identifies Dr. Mysiw's treatment notes and the same opinion form indicating that she could not live on her own, which the ALJ did not credit and which is not supported in the record. In short, the ALJ's opinion is sufficiently explained and is supported by substantial evidence.

### C. The ALJ did not err when assigning weight to Dr. Savage's opinion

Martin argues that the ALJ erred when she assigned "controlling" weight to the opinion of the ME, Dr. Savage, because Dr. Savage is not a mental health expert and he did not have access to Martin's neurocognitive testing. Tr. 17, p. 18. First, the ALJ did not give "controlling" weight to Dr. Savage's opinion; she gave "great" weight to Dr. Savage's opinion. Tr. 27. Second, Martin's counsel did not object to Dr. Savage's qualifications at the hearing. Third, the hearing took place two years after the testing; Dr. Savage did not have access to the testing results at the hearing because Martin's attorney apparently had not realized that it had not been submitted. It was not provided to the ALJ until after the hearing and only after the ALJ specifically ask Martin's attorney for it. Tr. 40-42.

That Dr. Savage did not have access to Martin's testing results does not amount to error because it is well established that an ALJ may rely on an opinion based on an incomplete record so long as the ALJ did review the later submitted records, as the ALJ did here. See Tr. 26 (ALJ discussing Martin's neuropsychological evaluation); *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504,

513 (6th Cir. 2010) (an ALJ does not err when she relies on state agency reviewing opinions based on an incomplete record when the ALJ considers the complete record). Moreover, as the ALJ observed, Martin's neuropsychological evaluation suggested overall that Martin could perform simple work. Tr. 26. Dr. Savage opined that Martin could perform activities of daily living. Tr. 71-72. The ALJ limited Martin to simple, routine tasks requiring no more than short, simple instructions and simple work-related decision making with few workplace changes. Tr. 25-26. In other words, these findings are consistent with one another, and Martin does not explain how access to the neuropsychological evaluation would have changed Dr. Savage's or the ALJ's opinion.

Finally, both Dr. Savage and the ALJ came to conclusions that were well-supported and easily identified to any reviewer of the record, i.e., Martin's issues with attention and mood had been successfully treated with medication, Tr. 73, 26; Martin is independent with daily activities, Tr. 71-72, 23-27; and Martin's true condition is not accurately described by Dr. Myshiw's treatment notes and opinions, Tr. 73-74, 27. It does not take a mental health expert to glean these facts from the overwhelming evidence. It should also be noted that Dr. Savage provided an opinion as to Martin's physical capabilities, which the ALJ took account of in her review when giving great weight to Dr. Savage's opinion. The ALJ did not err in her consideration of Dr. Savage's opinion.

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

IT IS SO ORDERED.

Dated: April 9, 2018

Kathleen B. Burke
United States Magistrate Judge